**JOHN J. CASALE, INC., Plaintiff,**

v.

**UNITED STATES of America and the Interstate Commerce Commission, Defendants.**

United States District Court
S. D. New York.

April 19, 1962.

Certiorari Denied Dec. 17, 1962.
See 83 S.Ct. 311.

Zelby & Burstein, New York City, for John J. Casale, Inc.; Herbert Burstein, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, for defendant United States. John F. X. Peloso, Asst. U. S. Atty., of counsel.

Stanton P. Sender, for defendant Interstate Commerce Commission.

Before HAYS, Circuit Judge, and CROAKE and LEVET, District Judges.

LEVET, District Judge.

This is an action brought to review an order of the Interstate Commerce Commission (referred to herein as the "Commission") in John J. Casale, Inc., Contract Carrier Application, Docket No. MC–20314 (Sub. No. 1). The Commission determined that plaintiff's proposed operation, whereby plaintiff would lease motor vehicles, with drivers who would be plaintiff's employees, to lessees for operation beyond the New York Commercial Zone, would constitute for-hire

carriage for which appropriate authority is required from the Commission; and that plaintiff's application for such authority should be denied. In its complaint, plaintiff does not challenge the denial of operating authority. Rather, it challenges only the conclusion of the Commission that the proposed operation would constitute for-hire carriage.

Subsequent to the filing of the complaint in this case, the Supreme Court issued its opinion in United States v. Drum, 368 U.S. 370, 82 S.Ct. 408, 7 L. Ed.2d 360 (1962). Based on this Supreme Court decision, which in our opinion is controlling, the action of the Commission must be affirmed.

## STATUTES INVOLVED

This case involves Sections 203(a) (14), 203(a) (15), 209(a) (1), and 203 (a) (17) of the Interstate Commerce Act, 49 U.S.C.A. §§ 303(a) (14), 303 (a) (15), 309(a) (1) and 303(a) (17).

Section 203(a) (14) defines common carrier by motor vehicle as follows:

"The term 'common carrier by motor vehicle' means any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes, except transportation by motor vehicle by an express company to the extent that such transportation has heretofore been subject to chapter 1 of this title, to which extent such transportation shall continue to be considered to be and shall be regulated as transportation subject to chapter 1 of this title."

Section 203(a) (15) defines contract carrier by motor vehicle as follows:

"The term 'contract carrier by motor vehicle' means any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation (other than transportation referred to in paragraph (14) of this section and the exception therein), under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."

Section 209(a) (1) provides as follows:

"Except as otherwise provided in this section and in section 310a of this title, no person shall engage in the business of a contract carrier by motor vehicle in interstate or foreign commerce on any public highway or within any reservation under the exclusive jurisdiction of the United States unless there is in force with respect to such carrier a permit issued by the Commission, authorizing such person to engage in such business: *Provided,* That, subject to section 310 of this title, if any such carrier or a predecessor in interest was in bona fide operation as a contract carrier by motor vehicle on July 1, 1935, over the route or routes or within the territory for which application is made and has so operated since that time, or, if engaged in furnishing seasonal service, only, was in bona fide operation on July 1, 1935, during the season ordinarily covered by its operations, except in either instance as to interruptions of service over which the applicant or its predecessor in interest had no control, the Commission shall issue such permit, without further proceedings, if application for such permit was made to the Commission as provided in subsection (b) of this section and within one hundred and twenty days after October 1, 1935, and if such carrier was registered on July 1, 1935, under any code of fair competition requiring registration, the

fact of registration shall be evidence of bona fide operation to be considered in connection with the issuance of such permit. Otherwise the application for such permit shall be decided in accordance with the procedure provided for in subsection (b) of this section and such permit shall be issued or denied accordingly. Pending determination of any such application the continuance of such operation shall be lawful. Any person, not included within the foregoing provisions of this paragraph, who or which is engaged in transportation as a contract carrier by motor vehicle when this section takes effect, may continue such operation for a period of one hundred and twenty days thereafter without a permit and, if application for such permit is made within such period, the carrier may, under such regulations as the Commission shall prescribe, continue such operation until otherwise ordered by the Commission: *Provided further,* That nothing in this chapter shall be construed to repeal, amend, or otherwise modify any Act or Acts relating to national parks and national monuments under the administrative jurisdiction of the Secretary of the Interior, or to withdraw such authority or control as may by law be held by the Secretary of the Interior with respect to the admission and operation of motor vehicles in any national park or national monument of the United States."

Section 203(a) (17) defines private carrier of property by motor vehicle as follows:

"The term 'private carrier of property by motor vehicle' means any person not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise."

The facts in United States v. Drum as set forth in the opinion were as follows:

"The Company presently owns 26 trailers and 6 tractors. It leases 11 tractors for long-haul use in connection with the trailers which it owns. It is solely in connection with the 11 leased tractors and the services of their owner-operators that the Commission discerned the provision of for-hire transportation. The leases are for renewable terms of one year, but they are terminable by either party on 30 days' notice. Oklahoma is granted the sole right to control the use of the tractor through drivers employed by it; in return, it covenants that such use will be lawful and will be confined to the transportation of the Company's property. Oklahoma pays for its use of the tractors strictly on a mileage basis. The owner receives weekly rental payments of 10 or 11 cents for each mile the vehicle is driven, plus an extra 3 cents per mile on the backhaul if there is a load of raw materials. Oklahoma does not guarantee any minimum mileage. Operating costs—including gasoline, oil, grease, parts, and registration fees —are paid by the owners. Oklahoma assumes no responsibility for wear and tear or damage to the tractors, nor does it provide collision or fire and theft insurance coverage—although it does pay for public liability and property damage insurance. The owners assume no responsibility to Oklahoma for damage to the cargoes.

"Under the collective agreement covering the drivers among its employees, the drivers enjoy certain common employment privileges such as collective bargaining, seniority rights, death benefits, immunity from discharge except for cause, military-service protection, and vacation pay in an amount based on

their average weekly pay. Owner-drivers may be discharged for cause. Their remuneration is calculated strictly on a mileage basis, and they are obliged to pay their own living expenses while on the road. No minimum weekly pay or mileage is guaranteed. Drivers are required to maintain their trucks in good running condition at all times.

"Oklahoma's actual operations were a generally faithful reflection of the leases and the collective agreement. Certain matters, not explicitly or unambiguously covered by the written instruments, are of significance. Ordinarily the drivers were assigned to their own tractors, though there were occasional exceptions. Oklahoma's truck superintendent testified that the owner-operators' services were not utilized each day. The owners were required to pay for all repairs, though Oklahoma conducted safety inspections. The Company closely directed all details of loading and delivery routes. It instructed the drivers as to steps to be taken in emergencies. It administered physical examinations, supervised the preparation of reports required by the Interstate Commerce Commission, paid social security taxes and withheld income taxes, and provided workmen's compensation.

"In sum, Oklahoma's operation possessed a number of the hallmarks of a genuine lease of equipment and a genuine employment arrangement.

"Still, the Company was able to spare itself—and pass to the owner-operators—certain characteristic burdens of the transportation business. The large capital investment in the tractors and the risk of their premature depreciation or catastrophic loss, was borne by the owner-operators, not by the Company. The owner-operators, rather than Oklahoma, stood the risk of a rise in variable costs such as fuel, repairs and maintenance of the tractors in good operating condition, and living expenses, although the thirty-day cancellation privilege, taken together with the possible bargaining power of the owner-operators *en bloc,* may have affected the degree to which that burden was actually shifted. Finally, Oklahoma was able to divest itself, to a significant extent, of the risk of non-utilization of high-priced equipment. The owner-operators received neither rental payments nor wages when their tractors were not used and they did not drive. Oklahoma did, however, carry the risk of a nonproductive backhaul." (pp. 377–380, 82 S.Ct. p. 412)

The issue in the Drum case was narrowly delineated as follows:

"The question before the Commission was whether, under these particular facts, Oklahoma had so far emancipated itself from the burdens of transportation that to permit it, on such terms, to secure a transportation service from these unlicensed owner-operators would be inconsistent with the statutory scheme."

In speaking of the tests which determined the ultimate question here involved, the court wrote:

"But a finding of shipper control does not require a resolution of the ultimate issue in the shipper's favor. It is true that until recently, 'control' has been at the focus of the Commission's efforts to delineate verbally the permissible area of non-licensed leases of transportation equipment. The initial technique of the Commission was to assess the lessee-shipper's assumption of the burdens of transportation in terms of the degree to which he undertook to 'control' or 'dominate' it. The interest in 'control' in turn generated an interest in whether the drivers of leased equipment were in substance treated as the shipper's employees. Throughout, however, Commission reports have taken note

of various factors which clearly transcend any narrow concept of physical direction of the details of the operation; and it has always been apparent that the vesting of such physical 'control' in the shipper would not in itself suffice to render the transportation private carriage.

"Latterly, the Commission has begun to move away from 'control' as the verbal embodiment of its manifold inquiry. The Commission thus accords explicit recognition to a premise which has long been implicit in its decisions: That some indicia of private carriage may be assumed, and detailed surveillance of operations undertaken, without a shipper's having significantly shouldered the burdens of transportation. The test of substance with which the Commission supplemented its 'control' inquiry in this case thus betokens no heedless departure from the beaten track of administrative decision which might occasion a judicial curb upon the exercise of administrative discretion. No more so does the inclusion in the arrangement between Oklahoma and its owner-drivers of a number of particulars also discoverable in arrangements found to constitute private carriage in earlier Commission decisions. We deal in totalities; indicia are instruments of decision, not touchstones. The Commission allowably dealt with this novel situation as an integral and unique problem in judgment, rather than simply as an exercise in counting commonplaces. Nor did it leave the basis for its decision unarticulated." (Notes omitted; pp. 382–384, 82 S. Ct. p. 414)

On this basis the court concluded that the determination of the district court must be reversed and the determination of the Commission upheld.

The basic facts in the case now before this court at the present time are not markedly different from those in United States v. Drum. There is apparently no dispute in respect to the Commission's findings as to the truck leasing arrangements here involved. It is the conclusions with which the plaintiff differs.

The Commission herein found that compensation for the lease of the trucks is based on a flat amount plus a mileage charge (Report, p. 4; Transcript, p. 381). Plaintiff maintains garage and repair facilities at points throughout the New York City area, where, except for road emergencies, it performs all maintenance and repairs on the equipment (Report, pp. 4, 5). Most of the truck leases provide for garage storage by plaintiff (Report, p. 4). Public liability and property damage insurance for all vehicles is provided by plaintiff (Report, p. 5). Normally, particular vehicles are assigned to a specific shipper-lessee by plaintiff, but if a vehicle becomes disabled, plaintiff provides a substitute vehicle (Report, p. 5; Transcript, p. 371).

Where equipment is leased with a driver provided by plaintiff, he provides a complete payroll service. The lessee is furnished a weekly statement showing the rental charge for the equipment plus the direct labor costs such as driver wage, fringe benefits, social security, unemployment insurance, workmen's compensation, taxes, pension and welfare contributions. Plaintiff pays the driver (Report, p. 4).

It further appears that the purpose of plaintiff's application is to relieve shipper-lessees operating beyond the Commercial Zone of the responsibility of carrying drivers on their payrolls. The witness Martin E. Coughlin of Thomas J. Lipton, Inc. testified in effect that Lipton preferred the Casale payroll service so as to relieve Lipton's payroll department of the burden of preparing payroll checks for one driver who has entirely different fringe benefits, working conditions, wage scales, etc. than other Lipton employees. Similar testimony was given by the witness Rodney W. Burton of Jones and Laughlin Steel Company.

Although the plaintiff contends that the shipper-lessees exercise direc-

tion and control over the details of the transportation operation, the Supreme Court in United States v. Drum, supra, has expressly affirmed the Commission's consistent position that such control is not incompatible with for-hire carriage and falls far short of establishing that the shipper-lessees are engaged in private carriage. Quite properly, therefore, the Commission as it now appears in the present case rejected the plaintiff's argument, saying (Report, pp. 12–13):

"It is true that in such matters as the loading of vehicles, scheduling of departures, and routing of traffic the lessees exercise complete control. But we do not attribute to this the all-important significance which applicant does. The lessees' control in this respect must be considered from the standpoint of the control which a shipper using for-hire carriage exercises over its traffic. It is not at all unusual for shippers to oversee the loading, arrange the departure, and even select the route over which the vehicle is to move. Carriers engaged in for-hire transportation perform a service which to a considerable degree is tailored to the shippers' requirements. So considered, we do not believe that the lessees' control over the physical transportation is so different as to warrant a finding that it is engaged in bona fide private carrier transportation."

Consequently, the Commission in reaching its determination that this was for-hire carriage did not rely entirely on the "control" test but looked at the totalities of the situation.

The plaintiff has suggested that this court remand this matter to the Commission for further study in light of United States v. Drum. In view of the facts in this case and the decision in Drum, we see no purpose to be served by such a remand.

■ As stated by Follmer, District Judge, in Edwards Motor Transit Com-

pany v. United States, D.C.N.D.Penn. 1962, 201 F.Supp. 918, 920:

"The jurisdiction conferred upon three-judge statutory district courts to review orders of the [Interstate Commerce] Commission is very definitely circumscribed. If an order of the Commission lies within the scope of a statute which the Commission is authorized to administer and enforce, and if the order is based upon adequate findings, which in turn are supported by substantial evidence, the order may not be set aside by a court on review even though the court might disagree with the Commission's conclusions or might consider them contrary to the weight of the evidence."

■ We are forced to conclude that the Commission acted within its statutory authority, that rational bases for its conclusion and order exist. Consequently, the complaint must be dismissed.