**AGRICULTURAL TRANSPORTATION ASSOCIATION OF TEXAS,**
Appellant,

v.

**Wilbur C. KING et al., Appellees.**

No. 21243.

United States Court of Appeals
Fifth Circuit.

Aug. 13, 1965.

874

John H. Cotten, Tallahassee, Fla., Richard T. Churchill, Fort Worth, Tex., Cotten, Shivers, Gwynn & Daniel, Tallahassee, Fla., for appellant.

B. Kenneth Gatlin, Lewis W. Petteway, Tallahassee, Fla., for appellees.

Before JONES and BROWN, Circuit Judges, and SHEEHY, District Judge.

JOHN R. BROWN, Circuit Judge:

Directly involved is the question whether the District Court was correct in denying a permanent injunction

against the Florida Public Utility Commission in the enforcement of Florida Motor Truck laws. But wrapped up in the question are a number of competing factors. One, of course, is the strong comity policy, legislatively reflected in 28 U.S.C.A. § 2283 of avoiding Federal Court interference in state judicial proceedings and especially criminal prosecutions. But pulling in the other direction is the fact that the Florida criminal law at stake inescapably has as its core a Federal standard. And that Federal standard calls for interpretation and application of two distinct legislative structures, one the Transportation Act, the other the Agricultural Marketing Act. And pleading always for recognition is the strong policy to facilitate, not thwart, free movement in interstate commerce. Complicating all of it further is the problem of the extent to which the trial Court ought in the past, or should in the future, defer action pending decision of all or a part of the underlying controversy by the Interstate Commerce Commission. In effect, we do not disapprove of the denial of the injunction. But we do vacate the order so that if further relief is sought after the remand, the District Court will refer it initially to the ICC.

## I.

Suit for injunction was filed by ATA [1] against FPUC [2] seeking an order prohibiting the arrest of its driver employees in the operation of trucks on Florida highways in interstate commerce. After a full hearing, the trial Court denied a permanent injunction. It is clear from the record that none of the arrests was for alleged violation of Florida highway safety regulations as to physical operations, speed, weight, or load. On the contrary, the arrests were made because, in the judgment of FPUC the interstate transportation was being effected by owner-drivers and not ATA. Since owner-drivers concededly did not have a Florida certificate, such operation is in violation of § 323.02 [3] and § 323.35 [4] of the Florida statutes, F.S.A., since it is likewise conceded that such owner-drivers did not have requisite authority from the Interstate Commerce Commission to bring themselves within the exemption of § 323.28(2). [5]

But this is the beginning, not the end, of the problem, for ATA, frankly recognizing this, asserts two things. First, ATA is a Texas nonprofit cooperative

1. Agricultural Transportation Association of Texas.

2. Florida Public Utilities Commission and its constituent Commissioners.

3. Fla.Stat.1963, § 323.02, F.S.A.: "No motor carrier shall operate any motor vehicle for the transportation of persons or property for compensation on any public highway in this state without first having obtained from the public utilities commission a certificate of public convenience and necessity or a permit as hereinafter provided or a certificate of registration of interstate commerce commission authority as hereinafter provided."

4. Fla.Stat.1963, § 323.35, F.S.A.: "Every officer, agent or employee of any corporation, and every other person who violates or fails to comply with, or who procures, aids or abets in the violation of any provisions of this chapter, or * * * regulation * * * of the railroad and public utilities commission, * * * is guilty of a misdemeanor and is punishable by a fine not exceeding $500.00 or by imprisonment in the county jail not exceeding 1 year."

5. Fla.Stat.1963, § 323.28, F.S.A.: "It shall be unlawful for any auto transportation company transporting for compensation in interstate commerce in Florida for which a certificate of public convenience and necessity or a permit is required from the interstate commerce commission to operate over the public highways of this state without first having filed a certified copy of such interstate commerce commission authority with the Florida railroad and public utilities commission and having obtained from said Florida commission a certificate of registration."

§ 323.28(1) recognizes Federal supremacy: "(1) Neither this chapter nor any provisions hereof shall apply or be construed to apply to commerce with foreign nations or commerce among the several states of the union except insofar as the same may be permitted under the provisions of the constitution of the United States and the acts of congress."

association [6] operating as a "cooperative association" under the Agricultural Marketing Act. As such it is authorized to engage in transportation services for nonmembers provided such "services with or for nonmembers" is not "in an amount greater in value than the total amount of such business transacted by it with or for members." [7] Second, this brings into play § 203(b) (5) of the Interstate Commerce Act [8] which exempts from regulation (other than safety) "motor vehicles controlled and operated by" an approved agricultural Co-op.

For the purpose of this case, it was, and is, assumed by all hands that ATA qualified as an authorized co-op under § 203(b) (5). [9] The controversy raged, therefore, around the question whether owner-driver trucks meet the exemption standard of "motor vehicles controlled and operated by" ATA.

This sets the stage. This reveals that while the immediate problem is compliance with Florida laws, what Florida laws demand presents a Federal question—clearly one proper for a Federal Court—in the application and interpretation of one, and perhaps two, Federal statutes.

## II.

At the time of the trial, ATA conducted all of its transportation services through the use of leased rolling stock. Each lease is for a term of one year with a 30-day written cancellation clause. The equipment must, of course, meet ATA's specifications as to size, type, weight, insulation, type of refrigerating equipment. And it must be and remain in operating condition which means that the owner-lessor bears the expense of replacement of tires and other accessory equipment, general repairs to the equip-

6. Cooperative Marketing Act of Texas, Tex.Civ.Stat.Ann. art. 5737–5764.

7. "As used in this subchapter, the term 'cooperative association' means any association in which farmers act together in processing, preparing for the market, handling, and/or marketing the farm products of persons so engaged, and also means any association in which farmers act together in purchasing, testing, grading, processing, distributing, and/or furnishing farm supplies and/or farm business services: Provided, however, That such associations are operated for the mutual benefit of the members thereof as such producers or purchasers and conform to one or both of the following requirements:
   "First. * * *
   "Second. * * *
   "And in any case to the following:
   "Third. That the association shall not deal in farm products, farm supplies, and farm business services with or for non-members in an amount greater in value than the total amount of such business transacted by it with or for members. * * *" 12 U.S.C.A. § 1141j.

8. § 203: "(b) Nothing in this chapter, * * * shall be construed to include * * * (5) motor vehicles controlled and operated by a cooperative association as defined in the Agricultural Marketing Act, approved June 15, 1929, as amended, or by a federation of such cooperative associations, if such federation possesses no greater powers or purposes than cooperative associations so defined; * *." 49 U.S.C.A. § 303(b) (5).

9. The findings reflect that the trial Court was informed of the pendency of MC-C-4028, Agricultural Transportation Association of Texas et al. Investigation of Operations and the order of Division 1 of the ICC, 96 MCC 293, holding ATA to have engaged illegally in transportation under § 206(a) or 209(a) and issuing a cease and desist order. After denial of intermediary petitions for reconsideration by Division 1, it was on April 20, 1965, accepted for reconsideration by the full Commission under its rules as a proceeding involving "an issue of general transportation importance." The matter is still pending. At issue is the percentage of member and nonmember transportation. Division 1 after concluding that nominally ATA satisfies the test states: "Unfortunately, ATA's adherence to matters of form has not been extended to matters of substance." 96 MCC 293, 303. This leads to an analysis of the status of its members and a determination that the transportation for members is not "functionally related" to the farm activities of such members. The Commission referred to Machinery Haulers Assn. v. Agricultural Commodity Service, 86 MCC 5, holding an alleged predecessor of ATA in violation.

ment, depreciation and consequences of ordinary wear and tear. In addition the owner-lessor must provide Texas registration, collision and upset insurance on equipment and the first $500 deductible on cargo insurance.

Lease rentals for the tractors and the refrigerated semi-trailers are computed separately for each completed trip. Under the lease ATA, the lessee, pays the owner-lessor a sum equal to 100% of the gross freight revenue received by ATA for the shipments based on the freight revenues received *less* two deductions.[10] The first deduction is a constant of 18% of the gross revenue. This is retained by ATA as compensation for administrative overhead and related services, and constitutes the sole source for its profits. The second group covers all operating expenses incurred by ATA (not including overhead covered by the 18%) for the operation of the equipment on the trip involved including, any deadhead on the outward or homeward legs. These operating expenses include all fuel, oil, registration fees, state licenses, road and fuel taxes, fuel bonds, permits, loading and unloading expense, cost of emergency road service or substitute equipment, all signs and identifying material placed on the leased equipment, cargo insurance (above the $500 deductible), public liability insurance, wages, social security, withholding taxes and workmen's compensation insurance on all drivers, the compensation being fixed on a mileage basis without regard to profits of the trip.

It is without any contradiction that all cargo is booked solely by ATA. It alone makes the quotation of rates and terms. It issues all bills of lading, shipping contracts, or documents and invoices and collects all freight charges. The equipment and the drivers are under the positive control of the central dispatch office at Fort Worth. It alone advises drivers where and when to pick up loads, where to deliver them, what routing to use, and what special handling, such as temperature for cargo spaces, specified time of delivery, and the like is required. None of the equipment or the drivers is ever trip-leased to anyone else or used by anyone else but ATA during the time the equipment remains under the lease to it.

### III.

■ Analyzing this briefly summarized arrangement in the light of United States v. Drum, 1962, 368 U.S. 370, 82 S.Ct. 408, 7 L.Ed.2d 360, the trial Judge concluded that the owner-driver-lessors were in effect paying 18% to ATA for cargo solicitation and related services and that ATA's contention of complete control and operation of these trucks through the payment of wages and on the road expenses * * * is a subterfuge * * *." [11] Although there was evidence concerning some highly artificial rearrangments of the legal title to some of this leased equipment,[12] we do not understand the Judge to have arrived at the conclusion of a "subterfuge" on the basis of facts showing that the operation was something other than that described in the lease. Rather, he concluded that the terms of the lease if faithfully carried out had this economic impact in fact. This results from the nature of the lease-formula by which nominally ATA pays the operating expenses but which are in fact borne directly by the owner-driver since these

---

10. There is an alternative mileage rental of 20¢ per mile, whichever is greater.

11. The District Judge, permissibly we think, did not distinguish between arrests made of trucks then being driven by owner-lessor-driver, those with owner-driver aboard but not driving, and those in which an owner-lessor-driver leased truck was being driven by an employee unaccompanied by the owner-lessor.

12. A few months previously ATA had filed an injunction suit in the same Court. Apparently it was dismissed by agreement on the understanding that ATA would not send any more leased trucks which were owner-driven. This led to some fancy reshuffling with one owner-lessor-driver transferring his truck to a family-owned entity of which his two-year-old son was a vice president.

are deducted from the 82% of gross revenues before any balance is available to remit to the owner-driver. In this sense, even direct mileage wages paid to the owner-driver are borne by him.[13]

■ Although ATA specifically challenges this as an erroneous fact finding, we certainly accept the Judge's conclusion on the economic impact. The opprobrium "subterfuge" probably adds little either to help or hinder solution. And in our consideration, we approach it as did the District Court. The record is clear that the arrests were made solely because the trucks were leased from owner-drivers under this particular type of lease agreement.[14] The question was whether ATA could legally do this. And the trial Judge faced directly up to the issue in stating, the "sole and limited issue before this Court is the determination of the legal effect of the factual arrangement between the co-operative and its lessors of rolling stock in the operation and control of the transportation furnished."

### IV.

Although strong arguments can be marshalled raising much doubt that Drum is as dispositive of this case as the District Judge thought, little is to be gained by that pursuit. While we make no holding as to the applicability of Drum, we think analysis of the decision in the light of other cases and the statute demonstrates even more graphically that the basic question ought first to be resolved by the ICC.

■■ In the first place, Drum deals with the highly specialized problem of so-called private carriage and the great abuses which led Congress by successive amendments to bolster the ICC's administrative weapons against it. This struggle is traced both in Drum and more recently in Red Ball Motor Freight, Inc. v. Shannon, 1964, 377 U.S. 311, 84 S.Ct. 1260, 12 L.Ed.2d 341. As those cases and that history reflect, at no time was it intended that a "private carrier" should ever be permitted to engage in transportation as such. What, and all, a "private carrier" could do was to carry its own goods.[15] Congress, at the persistent behest of the ICC, made this doubly clear in the 1958 amendments. Even one who is "the owner, lessee, or bailee" of property which is being carried "for the purpose of sale, lease, rent, or bailment" if "engaged in any other business" may not "transport property by motor vehicle in interstate * * * commerce for business purposes *unless* such transportation is within the scope, and in furtherance, of a primary business enterprise (*other than transportation*) of such person."[16] (Emphasis supplied) Within the highly complex, intensely regulated, structure of common-contract-motor carrier transportation, the aim of Congress was to assure a healthy regulated monopoly of for-hire carriage while preserving the right of one to transport his own private property by his own transportation facilities.

But the congressional treatment of approved agricultural co-ops is quite dif-

---

13. If operating expenses or advances exceed the 82%, mileage wages are nevertheless paid, but ATA recoups such "excess" payments from settlements of subsequent trips.

14. No question was raised that the commodities being carried were nonexempt under § 203(b) (6), 49 U.S.C.A. § 303(b) (6); 49 C.F.R. § 210.25, see note 17, infra.

15. As Shannon points out, prior to the 1957 and 1958 amendments to § 203(c), the sole way the ICC "was able to reach such abuses," 377 U.S. at 313, 84 S.Ct. at 1262, was through interpretation of the definitive section. Section 203(a) (17), 49 U.S.C.A. § 303(a) (17), which provides: "The term 'private carrier of property by motor vehicle' means any person not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise."

16. As added 72 Stat. 574, 1958. See note 1 in Shannon and note 3 Drum.

ferent. As to co-ops, just as to other accorded statutory exemptions, the Transportation Act recognizes that such persons are entitled to, and in fact do engage in, transportation as carriers for-hire. Thus, as the most prominent and frequent source of litigation, is the subsection (6) exemption of "motor vehicles used in carrying property consisting of ordinary livestock, fish * * * or agricultural * * * commodities * * *." § 203(b) (6), 49 U.S.C.A. § 303(b) (6).[17] Others are the three-bulk-cargo and liquid-bulk-cargos-in-tank-vessels exemptions under the parallel provisions of Part III for water carriers.[18]

And the same consequence is evident under § 203(b) (5) for qualified agricultural co-ops when that section is read together with the Agricultural Marketing Act (note 7, supra). By the terms of the Act, it is certain that Congress recognized that such co-ops would be engaging in for-hire transportation. See ICC v. Jamestown Farmers Union Federated Co-operative Transportation Assn., D.Minn., 1944, 57 F.Supp. 749, 751. Such co-ops were not to be confined to the transportation of commodities belonging to, or to be delivered to, its own members. The only limitation for transportation services, as all other activities, was that such "business services with or for nonmembers" should not be "in an amount greater in value" than that transacted by it for its members. Indeed, unlike § 203(b) (6) (see note 17, supra), which ties the exemption to vehicles and particular agricultural, etc. commodities, the only limitation under the Marketing Act is on the comparative dollar revenue of member and non-member business. The legislative history also demonstrates that Congress was aware that cooperative associations were then engaging in for-hire transportation activities, and some appropriate recognition had to be taken when the Motor Carrier Act was enacted in 1935.[19]

Since it is plain that agricultural co-ops are entitled to engage in transporation for-hire for members of the public so long as the 49% plus ceiling is maintained on non-member business, the modifying terms in § 203(b) (5) "controlled and operated by" ought to be looked at in the light of a recognized for-hire common (or contract) motor carrier. In dealing with the prob-

17. See Frozen Food Express v. United States, S.D.Tex. (3 Judge), 1955, 128 F. Supp. 374, affirmed, 351 U.S. 49, 76 S.Ct. 574, 100 L.Ed. 917; Frozen Food Express v. United States, S.D.Tex. (3 Judge), 1956, 148 F.Supp. 399, affirmed, 355 U.S. 6, 78 S.Ct. 38, 2 L.Ed.2d 22; and ICC Regulations, 49 C.F.R. 210.25, Administrative Ruling 107, legislatively approved as list of exempt commodities by 1958 amendments also establishing grandfather rights; Frozen Food Express v. United States, N.D.Tex. (3 Judge), 1963, 219 F.Supp. 131; Jarman v. United States, D.Md. (3 Judge), 1963, 219 F. Supp. 108; Winder Garden Co. v. United States, E.D.Tenn. (3 Judge), 1962, 211 F.Supp. 280; Willis Shaw Frozen Express, Inc. v. United States, 1964, 377 U. S. 159, 84 S.Ct. 1154, 12 L.Ed.2d 211.

18. § 303(b) and (d), 49 U.S.C.A. § 903(b) and (d). See Commercial Barge Lines, Inc. v. United States, E.D.Mich. (3 Judge), 1958, 166 F.Supp. 867, affirmed, 359 U.S. 342, 79 S.Ct. 896, 3 L.Ed.2d 927.

19. See the remarks of Representative Jones of Texas in connection with the proposed amendment which eventually became § 203(b) (5), 49 U.S.C.A. § 303(b) (5), at 79 Cong.Record 12219: "They [Cooperative Associations] should be permitted to operate as they have always operated under the restriction of the legal and accepted definition. Otherwise, if they accepted any outside business, they would become common carriers and would be required to accept [all shipments tendered] * * *. They are now given permission to handle not exceeding the same amount for non-members that they handle for themselves. Under these terms they have operated for years. Without the proposed amendment, the Bill would * * * prevent their continuing their present method of doing business. * * * The trouble is that your definition of common carrier would regulate them out of business."

lem whether it is essential that the carrier own outright equipment required for the performance of the transportation, it is significant that the Transportation Act treats "service" and "transportation" in broad terms to "include all vehicles operated by, for, or in the interest of any motor carrier irrespective of ownership or of contract, express or implied." [20] Moreover, the Supreme Court has held that the definition of "common carrier by motor vehicle," as amended in 1940 and now appears as § 203(a) (14), 49 U.S.C.A. § 303(a) (14), has the same meaning as the original 1935 section to include any person "who * * * undertakes, 'whether directly or by a lease or any other arrangement,' to transport * * *." Thomson v. United States, 1944, 321 U.S. 19, 23, 64 S.Ct. 392, 394, 88 L.Ed. 513.[21]

And the Supreme Court has twice specifically recognized that in determining the question of *who* is the carrier, i. e., the person engaging in the *transportation*, the solution does not depend on the status of the ownership of the equipment being employed or, for that matter, the physical control over the operation thereof. Thus, in United States v. Rosenblum Truck Lines, 1941, 315 U.S.

50, 62 S.Ct. 445, 86 L.Ed. 671, grandfather rights under § 209(a), 49 U.S. C.A. § 309(a), were accorded the railroad rather than the owner and operator of the motor trucks carrying cargo for the railroad under contract. The grandfather clause, like § 203(b) (5) "controlled and *operated* by", speaks in terms of one who "was in bona fide *operation*" as a common or contract carrier.[22] The motor truck owners, much as the owner-lessor-drivers here, had to bear the cost of fire, theft and collision insurance, paid operating and maintenance costs, assumed some cargo damage claims and hired and paid the drivers as their employees. And in Thomson v. United States, 1944, 321 U.S. 19, 64 S.Ct. 392, 395, 88 L.Ed. 513 (see note 21, supra), the Court reversing the ICC, declared that the railroad carrier, not the motor vehicle actual operator, was entitled to the grandfather rights. This was so even though the contracts between railroad and truck owners described the operators as "independent contractors" and the facts showed actual, complete independent physical control. Thus drivers were employees of the truck owner who paid all operating expenses including indemnification of the railroad against loss or damage claims, costs of insurance, and

20. § 203(a) (19), 49 U.S.C.A. § 303(a) (19): "The 'services' and 'transportation' to which this chapter applies include all vehicles operated by, for, or in the interest of any motor carrier irrespective of ownership or of contract, express or implied, together with all facilities and property operated or controlled by any such carrier or carriers, and used in the transportation of passengers or property in interstate or foreign commerce or in the performance of any service in connection therewith." Cf. § 202(c) (1) and (2), 49 U.S.C.A. § 302(c) (1) and (2). See also § 202(a), 49 U.S.C.A. § 302(a): "The provisions of this chapter apply to the transportation of * * * property by motor carriers engaged in interstate * * * commerce and to the procurement of and the provisions of facilities for such transportation, and the regulation of such transportation, and of the procurement thereof, and the provision of facilities therefor, is vested in the Interstate Commerce Commission."

21. "Originally the term 'common carrier by motor vehicle' was defined to include any person who undertakes, 'whether directly or by a lease or any other arrangement,' to transport passengers or property for the general public * * *. For purposes of clarity, however, this language was stricken and the term was redefined by Congress in 1940 to include any person 'which holds itself out to the general public to engage in the transportation by motor vehicle' of * * * property." [2] Note 2 stated: "Section 203(a) (14) as amended by the Transportation Act of 1940 * * *. No change in the legislative intent with respect to the definition of common carriers * * * was evidenced by this amendment. See 86 Cong.Rec. 11546." 321 U.S. at 23–24, 64 S.Ct. at 394.

22. §§ 206(a) (1) and 209(a) (1), 49 U.S. C.A. §§ 306(a) (1) and 309(a) (1).

the like. The Court held this was transportation by the railroad, not the contractor. The Court's language bears a strong parallel to that here.[23] In doing so the Court, just as it did by ignoring it as insignificant in Drum, here rejected the ICC's application of the common law control test to phyical operations of the vehicles. Of it they said, "This so-called 'control and reponsibility' test, however, is applicable in this case only insofar as it aids in determining the person offering and engaging in the single coordinated rail-motor freight service. To the extent that it leads to a result different from that reached by the application of the statutory provisions and the Congressional intent which we have indicated, it must be disapproved." 321 U.S. at 26, 64 S.Ct. at 395, 88 L.Ed. at 518.[24]

And probably of the greatest significance is the fact that the ICC, the body charged with responsibility for developing and maintaining a strong national transport system with the full legislative blessing of Congress, recognizes in a formal and vital way that carriers (common or contract) are entitled to obtain needed equipment and augment fleets to care for increases in traffic [25] by means of leases. The trail followed, long and tortuous, is well described in Christian v. United States, D.Md., (3 Judge), 1957, 152 F.Supp. 561. It begins in 1947-48 with Ex Parte No. MC-43, Lease and Interchange of Vehicles By Motor Carriers. There are four published official ICC reports comprising over 206 printed pages which reflect the painstaking care with which the ICC sought the views and obtained evidence as to all phases of motor transportation including state regulatory agencies.[26] En route, the Commission's power to promulgate these regulations was upheld by the Supreme Court.[27] And Congress twice took notice of this comprehensive project by legislation which both affirmed the existence of power to regulate the leasing of vehicles to carriers and prohibited restrictions as to trip leasing of agricultural commodity exempt vehicles.[28]

23. This is graphically portrayed by substituting "ATA" for "railroad". "The [ATA] has consistently held itself out to the general public and to shippers as being engaged in this * * * freight service. It [ATA] solicits all the freight transported by the trucks operating as part of this unified service and its bills of lading and tariffs are used throughout. * * * In so [using] motor vehicle service, the [ATA] has not deemed it advisable to purchase or lease motor trucks or to employ its own personnel in such operations. * * * But the [ATA] at all times maintains direct and complete control of the movement and handling of its freight by these operators. It fixes the truck schedules so as to coordinate them * * * and designates the amount and particular shipments of freight to be moved. The motor vehicle operators issue no billing of any kind and solicit none of the freight transported for the [ATA]. They have no contractual or other relationships with either the shippers or the receivers of the freight." 321 U.S. at 21, 64 S.Ct. at 393.

24. A similar result was reached under Part III for water carriers with the grandfather rights accorded not to the one doing the actual towing under contract, but to the person for whom the towing had been done. DeBardelben Coal Corp. v. United States, W.D.Pa. (3 Judge), 1944, 54 F.Supp. 643.

25. § 208(a), 49 U.S.C.A. § 308(a) prescribes that "no terms, conditions, or limitations" of a certificate of public convenience and necessity, "shall restrict the right of the carrier to add his to its equipment and facilities * * * as the development of the business and the demands of the public shall require." Cf. United States v. Seatrain Lines, 1947, 329 U.S. 424, 431-432, 67 S.Ct. 435, 91 L.Ed. 396.

26. 51 MCC 461-550 (1950); 52 MCC 675-754 (1951); 64 MCC 361-387 (1955); 68 MCC 553-565 (1956).

27. American Trucking Associations v. United States, 1953, 344 U.S. 298, 73 S. Ct. 307, 97 L.Ed. 337.

28. § 204(e), (f), 49 U.S.C.A. § 304(e), (f), added by amendment in 1956, Aug. 3, 1956, c. 905, § 2, 70 Stat. 958 (replacing the earlier 1942 sections which expired March 1947). It provides: "(e) [s]ubject to the provisions of subsection (f) * * * the Commission is authorized to prescribe, with respect to the use by motor carriers (under leases, contracts, or

With interim regulations and exemptions adopted from time to time, the end was reached in 1956 with the promulgation of the regulations in final form, 68 MCC 553, which now appear as 49 C.F.R. § 207.1–6.[29]

As the reports (note 26, supra) reflect, in this rule-making process the ICC considered and analyzed the contentions and objections of every phase of the business. Of particular importance to our case was the Commission's preoccupation with two things when the vehicle was owner-operated: (1) the duration of the lease, and (2) compensating the lessor by a percentage of the freight revenues received by the carrier-lessee. As to the first, trip leasing, thought to be provocative of many of the abuses, was prohibited and a minimum 30-day lease period was fixed.[30] All of ATA's leases satisfy this. As to the second, this really demonstrates that law making when done through rule-making is the product of experience born often of experimentation. For in the initial decision, Division 5, despite the urgings of its Bureau of Motor Carriers, and others, to prohibit compensation of owner-driver lessors by a percentage of freight revenues, concluded that it should not "specify any basis for the compensation for the use of the leased equipment." 51 MCC 461, 528. When reviewed by the full Commission, the ICC flatly held "that compensation for the rental of equipment based upon a percentage of the revenue earned with the equipment should be prohibited." 52 MCC 675, 726. In the 1955 review the ICC adhered to this prohibition except as to a few exemptions. 64 MCC 361, 384–5.[31] But eight years after the refusal of Division 5 to prohibit percentage compensation, the full Commission completed the round trip by holding that " * * * the previously issued regulations are being modified by the cancellation of those provisions governing the basis of compensation * * *." 68 MCC 553, 556.[32] Far from indicating an arbitrary indecisiveness, the ICC recognized that they had reached the point where the proposed "rules must be put in force * * * or put away" with the likelihood "that the entire subject may * * * require consideration at some future date * * *" and with a realization that as "we close the books

other arrangements) of motor vehicles not owned by them * * *." In (f) regulation was prohibited as to leases of vehicles within §§ 203(b) (4a), (5); (a) (17); (b) (6).

29. The regulations (§ 207.4) permit authorized carriers (common or contract) to "perform authorized transportation in or with equipment which they do not own * * * under the following conditions." A written contract is required, § 207.4(a) (2), prescribing (3) minimum period of 30 days if owner-driver, (4) exclusive possession and responsibility in lessee-carrier, (5) the specific compensation as lease rental, (6) duration, (7) (a) requiring copies of lease to be on vehicle, (b) receipts for equipment, (c) safety inspection, (d) identifying markings on vehicle, (e) pre-employment medical examination of driver and safety instruction, and (f) record of equipment with cargo manifests, etc.

30. § 207.4: "(3) *Minimum duration of 30 days when operated by lessor.* [The written contract] Shall specify the period for which it applies, which shall be not less than 30 days when the equipment is to be operated for the authorized carrier by the owner or employee of the owner * * *."

It is interesting to note that the Florida Citrus Commission, likewise an agency of the State of Florida, favored trip leasing and opposed the 30-day restriction, 64 MCC 361, 369.

31. § 207.4(a) (5) was then amended to read: "(5) [The contract] Shall specify the compensation to be paid the lessee for the rental of the leased equipment; provided, however, that such compensation shall not be computed on the basis of any division or percentage of any applicable rate or rates on any commodity * * * transported * * * on said equipment * * * except * * * (i) [not here pertinent]."

32. As there promulgated, appendix B (68 MCC 553, 559, 561), § 207.4(a) (5) now provides: The contract "(5) Shall specify the compensation to be paid by the lessee for the rental of the leased equipment."

on the past record * * *," it is "from this point forward" that "we start with a clean slate upon which to record the results of the regulations being put into effect." [33]

Of course, in ATA's leases the 82% appears to be merely a variation of this permissible method.

It concludes the analysis to emphasize that Drum is of perhaps limited application since, as the Court points out, the three-Judge District Court has held that the shipper had control over the operation of the trucks. This ruling was not challenged on the appeal. "But," the Court declared, "a finding of shipper control does not require a resolution of the ultimate issue in the shipper's favor." 368 U.S. at 382, 82 S.Ct. at 414. Rather, the Court approved the more recent substantive test of the Commission which requires that for it to be authorized private carriage when performed by equipment not operated by the shipper's direct employees, such shipper must have significantly shouldered the burdens of transportation.

With this background, it becomes evident that Drum was dealing with quite a different situation. Who is a private carrier, when does transportation effected by a shipper for movement of a shipper's own goods cease to be private carriage and become unauthorized transportation, does not turn on control.

■ And yet the test of § 203(b) (5) is whether the motor vehicle is "controlled" and operated by the co-op. As in the grandfather cases, the law recognizes that one having the status and statutory responsibility of a carrier (common or contract) may both "control" and "operate" vehicles under lease or contract to it. Regulation comes from regulating the carrier, not the vehicle-furnisher.

Moreover, Drum makes two further things clear. The first is that the test fashioned continuously by the authoritative policy making agency, the ICC, is an evolving one. Efforts to analogize to the handy, but frequently artificial common law test of "control" are giving way more and more to the composite one of substance. Second, as the newer approach takes over and reliance can come less and less from "indicia" which "are the instruments of decision, not touchstones," the ICC, and the Courts, must deal with these situations "as an integral and unique problem in judgment, rather than simply as an exercise in counting common-places." 368 U.S. at 384, 82 S.Ct. at 415. That task of judgment becomes likewise more and more delicate.

V.

■■ This brief résumé of Federal transportation policy demonstrates that the important question is *who*, within Federal machinery in the first instance, should make these delicate judgments. This is not to suggest an intrusion by the Federal Government into the State domain, because the relevant Florida motor truck statutes (see notes 3 and 5, supra) are cast in terms which recognize the right to engage in any interstate motor truck transportation which is authorized by Federal law. The Florida test becomes the Federal test. Nor is it a suggestion that when cases, criminal or civil, under these statutes are properly before the Florida State Courts, they are any less competent in the resolution of this built-in Federal question. Rather, our problem is one of Federal judicial administration precipitated by reason of the filing of a case within the jurisdiction of the District Court and which it had to entertain.

On this score, we think the case as it now comes to us calls for the exercise of primary jurisdiction by the ICC as a condition precedent to any future relief. That this leaves to the ICC initial responsibility for making fact findings and perhaps the even more decisive task of fashioning a policy which it articulates in terms of a legal standard, is no longer an argument against the power to invoke

33. Quotations from 68 MCC 553 at 553–557.

decision by the administrative agency. Southwestern Sugar and Molasses Co. v. River Terminals Corp., 1959, 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334, 1959 AMC 1631; Far Eastern Conference v. United States, 1952, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576; United States v. Western Pacific R., 1956, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126; United States v. Chesapeake and Ohio Ry., 1956, 352 U.S. 77, 77 S.Ct. 172, 1 L.Ed.2d 140. And see our recent decision, Louisville & Nashville R. v. Knox Homes Corp., 5 Cir., 1965, 343 F.2d 887, which points out that in several of these cases the reference to the ICC was of a question of transportation law, not just the interpretation of obscure tariffs.

This will—or at least tends to—balance many of these delicate factors. First, it serves to ascertain the controlling standard in the context of an adequate record developing fully a factual basis for policy determination. Just what is the Federal legal standard of vehicles "controlled and operated by" a co-op? Is it the common law control test? The private carrier substantial test? Are co-ops, as exempt carriers, entitled to use the same sort of lease arrangements as would a certificated common (or contract) carrier? Do the ICC regulations for common (or contract) carriers on leases extend to exempt for-hire carriers? If so, does this arrangement suffice? In the final analysis the ICC must someday decide this question. For while it is a legal question on which Courts will ultimately rule, Drum and Shannon illustrate the practical decisiveness of administratively wrought legal standards.

Second, this serves the strong policy of our working Federalism to minimize unseeming conflict between the Federal and Florida State Courts especially in the area of criminal law enforcement and the strong appeal of comity epitomized by Douglass v. City of Jeannette, 1943, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324; 28 U.S.C.A. § 2283; cf. Dilworth v.

Riner, 5 Cir., 1965, 343 F.2d 226. Florida properly intends to enforce its laws. But Florida law fully and expressly respects the Federal right. A genuine doubt exists as to whether this arrangement satisfies Federal law. If it does, this record makes it certain that Florida would not arrest either drivers or owners or ATA for acting under it. The important thing is to obtain, if possible, an authoritative ruling which in a practical sense would be binding on all—ATA, owner-drivers and Florida. Arrests and trials of owners-drivers no matter how adequate for the arrested driver-defendant, will hardly suffice for ATA whose like operations cease with the campaign of arrests. In view of the heavy burden of proof beyond reasonable doubt, acquittals or reversals of convictions will mean little to ATA either as res judicata, collateral estoppel or as establishing a legal principle. Cf. United States v. Burch, 5 Cir., 1961, 294 F.2d 1. A full dress review of the underlying issue by the Supreme Court of Florida in an appeal from a conviction would be quite another thing. But there is no way of predicting whether or when that might occur.

Third, this simultaneously serves the Federal policy of the flow of interstate commerce unobstructed by even State laws or practices. Congress has granted this right to co-ops. Florida does not desire—and it could not if it did—to lessen or thwart any practice by ATA or owner-drivers which the Federal law permits. Indeed, it disclaims any such purpose.[34] Of course it is important that within the sphere of its powers, Florida be allowed to enforce its laws and prosecute those accused of their violation. But it is equally important that commerce between the states enjoy that free, uninterrupted flow as validly prescribed by Congress.

Fourth, it serves to keep Florida in the case and the case in Florida. Florida has a strong interest at stake. But this being ultimately a Federal question, there is a risk that either by Court or

---

34. See note 5, supra. § 323.28(1) and (2).

ICC decision, the issue will be resolved in a case in which Florida, not a party, is not heard. On a reference to the ICC from the Court below, Florida may participate fully in the administrative proceedings and the statutory three-Judge Court review since that now comes back to the Court initiating the reference.[35]

## VI.

Having reached the conclusion that this case calls initially for the expertise of the ICC, it would be manifestly improper for us to undertake the task of determining whether the District Judge was right or wrong on the underlying question. We do not hold that he erred nor do we hold that he was correct. There is, of course, the element—indeed important, sometimes decisive—of discretion in granting or denying injunctive relief. In some situations it would be enough merely to say that "no abuse" of the Judge's discretion has been shown and affirm. But that leaves the parties and, for that matter, the flow of commerce frustrated. More than that, affirmance carries with it overtones of res judicata, or collateral estoppel, at least as between ATA and Florida. If the matter is first to be referred to the ICC, that agency ought to be able to probe the problem and arrive at a conclusion unfettered by a prior adjudication perhaps equivocal in nature as being primarily on the intrinsic merits of the legality of the arrangement, but partly on equitable discretion.

To avoid this we vacate the judgment and remand the case for further consistent proceedings. If either of the parties thereafter seek relief, the District Court shall direct the parties to refer the matter by appropriate proceedings to the ICC. Pending such reference, the trial Court will be completely free under usual equitable principles to determine whether to grant or deny interim relief. Nothing said or unsaid is to be understood as an expression of any view thereon.

Judgment vacated and remanded.

35. 28 U.S.C.A. § 1336, as amended Aug. 30, 1964; see Louisville & Nashville R.

Co. v. Knox Homes Corp., 5 Cir., 1965, 343 F.2d 887, 893 n. 28.