**UNITED STATES of America,**
Appellee,

v.

**CASALE CAR LEASING, INC.,**
Appellant.

**No. 96, Docket 31253.**

United States Court of Appeals
Second Circuit.

Argued Oct. 24, 1967.

Decided Nov. 29, 1967.

Jon O. Newman, U. S. Atty., District of Connecticut (Seymour Glanzer, Regional Atty., Interstate Commerce Commission, Bernard A. Gould, Director, Bureau of Enforcement, Interstate Commerce Commission, of counsel), for appellee.

Herbert Burstein, New York City (Arthur Liberstein, Zelby & Burstein, New York City, Joseloff, Murrett & Knierim, Hartford, Conn., of counsel), for appellant.

Before FRIENDLY, KAUFMAN and ANDERSON, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

On March 7, 1967, a judgment of conviction [1] was entered against Casale Car Leasing, Inc. [Casale] for knowingly and wilfully engaging in the business of a contract carrier by motor vehicle in interstate commerce without a permit issued by the Interstate Commerce Commission [Commission] in violation of sections 209(a) and 222(a) of the Interstate Commerce Act [Act], 49 U.S.C. §§ 309(a) and 322(a).[2]  This appeal by Ca-

---

1. Casale was sentenced to pay a fine of $5,000, having been found guilty of each of 20 counts of a criminal information.

2. The structure of the act is relatively simple.  Section 203(a) (15) defines "contract carrier by motor vehicle" as:

    * * * any person which engages in transportation by motor vehicle of passengers or property in interstate or for-

eign commerce, for compensation * * * [exceptions not here pertinent] under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation serv-

sale presents a single narrow issue—did Judge Clarie submit the case to the jury under proper instructions?

The basic facts are not in dispute and can be stated briefly. In August of 1962 Casale leased certain trucks to Horn and Hardart Company [Horn & Hardart] to be used in the distribution of bakery products in New York City and between the City and various points in Connecticut.[3] Prior to 1962 Horn & Hardart had used its own trucks driven by its employees. For reasons that are not entirely clear, this arrangement proved unsatisfactory. But a clue to the problem is given by the development of labor difficulties. Horn & Hardart truck drivers were union members while the employees at its baking commissary were not organized. The lease agreement was intended to solve this complication by transferring the drivers to the employ of Casale.

As is so often true, however, the solution to one problem spawns another. In this case it was the government's prosecution of Casale. Under the terms of the lease, Casale supplied the trucks, provided full care and maintenance and carried public liability and property damage insurance.[4] In addition, the drivers were carried on its books as employees. Accordingly, Casale paid the drivers, arranged for the necessary withholding tax deductions and carried workmen's compensation and unemployment insurance. Casale also entered into a collective bargaining agreement with the drivers' union, albeit as the "agent" of Horn & Hardart.

The relationship between Casale, Horn & Hardart and the drivers cannot, however, be defined in simplistic terms. For example, while Casale theoretically was the drivers' employer, Horn & Hardart "guaranteed" the collective bargaining agreement entered into between Casale and the union, and agreed to remain responsible to the union for the performance of the agreement even if the lease with Casale was terminated. Also, when the drivers entered Casale's employ they retained the seniority they had accumulated while in Horn & Hardart's employ. And, although Casale paid the drivers, Horn & Hardart determined their wages and other benefits. Moreover, Horn & Hardart reimbursed Casale for the costs it incurred in paying the drivers and carrying appropriate employment insurance and Casale made no profit on these bookkeeping transactions.

The financial provisions of the lease were also complex. For the use of the trucks Horn & Hardart paid a fixed charge plus an amount determined by mileage; the fixed charge was to be paid even if vehicles were not used. An escalator clause provided that if the cost of fuel, repairs or maintenance—paid by Casale—rose, the difference would be passed on to Horn & Hardart through

ices designed to meet the distinct need of each individual customer.

Section 209(a) (1) provides that:

Except as otherwise provided in this section and in section 310a of this title [exceptions not here pertinent], no person shall engage in the business of a contract carrier by motor vehicle in interstate or foreign commerce on any public highway or within any reservation under the exclusive jurisdiction of the United States unless there is in force with respect to such carrier a permit issued by the Commission, authorizing such person to engage in such business * * *.

And Section 222(a) of the Act states that:

Any person knowingly and wilfully violating any provision of this chapter, or any rule, regulation, requirement, or order thereunder, or any term or condition of any certificate, permit, or license, for which a penalty is not otherwise herein provided, shall, upon conviction thereof, be fined not less than $100 nor more than $500 for the first offense and not less than $200 nor more than $500 for any subsequent offense. Each day of such violation shall constitute a separate offense.

3. The written lease was not placed in evidence.

4. Casale, however, was not responsible for the cargo transported in the leased trucks and in the event of any damage or loss, Horn & Hardart had no recourse against Casale.

an increase in the rental charge. In addition, Horn & Hardart could terminate the lease only if it purchased the leased equipment (with a deduction for depreciation), and in such instance the employees would return to the payroll of Horn & Hardart (or be placed on the payroll of a leasing concern succeeding to Casale's status).

The arrangement worked out in practice as follows: On a typical day, a driver would punch in at Horn & Hardart's commissary, cross the street to pick up his truck at a garage Casale rented from Horn & Hardart, and return to the commissary. Horn & Hardart's foreman dispatched the drivers giving them instructions as to what to receive and where to deliver. Daniel Clark, one of the drivers, testified that he never carried any Casale shipping documents and that he considered himself an employee of Horn & Hardart. And, according to Harold Kromer, Horn & Hardart's dispatcher, Casale never interfered with Horn & Hardart's operation of the leased equipment. Casale's fleet supervisor testified, however, that he checked to see that all drivers had medical certificates as required by the Commission [5] and there was evidence that at least on one occasion he instructed a driver concerning speed and care of the vehicle.

On these facts, Judge Clarie, after listing the elements of the offense, charged the jury that:

> With respect to the first element of the offense, engaging in the business of a contract carrier, the law provides a standard which you are to apply in deciding whether this defendant is engaged in the business of a contract carrier. That standard is met by any corporation which assumes the responsibility for furnishing motor vehicles to a shipper, and itself employs the drivers of those vehicles.

> In considering whether this defendant, Casale Car Leasing, Incorporated, has furnished motor vehicles to Horn & Hardart, the shipper in this case, you may consider whether the defendant * * * owns the vehicles; whether the defendant, Casale, undertakes to repair and maintain the vehicles, and whether the defendant provides insurance for the vehicles.

> In considering whether the defendant * * * employs the drivers, you may consider whether the defendant pays the wages of the drivers, provides services related to employment, such as maintaining payroll records, making payroll deductions, and negotiating collective bargaining agreements with respect to these employees, and paying the Workmen's Compensation insurance coverage during the period they are rendering their services.

■ We do not question the fact that if these instructions adequately stated the law, there was sufficient evidence to support the conviction. We hold, however, that Judge Clarie's charge failed to present the jury with a correct view of all the issues to be properly considered under the Act and therefore reverse.[6]

The objectives and interpretation of the provisions of the Act with which we are concerned were explicated at some length by the Supreme Court in United States v. Drum, 368 U.S. 370, 82 S.Ct. 408, 7 L.Ed.2d 360 (1962) (a civil case brought to set aside the Commission's cease and desist order), and we see no need for a total repetition. For our purposes, it is sufficient to note that the Court recognized that each case under the Act presents a "novel situation as an integral and unique problem in judgment," id. at 384, 82 S.Ct. at 415, and rejected any construction of the Act that would elevate arbitrary and formal dis-

---

5. See 49 CFR 291, at that time 49 CFR 191 (the regulations are now under the jurisdiction of the new Department of Transportation).

6. Casale made timely objections and sufficiently apprised the district judge of the deficiencies in the instructions.

tinctions and ignore the practical effects on the industry. Thus, the Court stated:

> From the outset the Commission has correctly interpreted them [the definitional sections of the Act] as importing that a purported private carrier who hires the instrumentalities of transportation from another must—if he is not to utilize a licensed carrier —assume in significant measure the characteristic burdens of the transportation business. The problem is one of determining—by reference to the clear but broad remedial purpose of a regulatory statute committed to agency administration—the applicability to a narrow fact situation of imprecise definitional language which delineates the coverage of the measure.

Id. at 375–376, 82 S.Ct. at 411. After examining the relevant economic factors, the Court concluded that the Commission was "well within the range of the responsibilities" assigned to it by Congress when it found that the shipper had shifted the significant burdens of transportation to the carrier.[7]

It is clear that Judge Clarie's instructions failed to submit to the jury the question of whether Casale or Horn & Hardart bore all or substantially all of the characteristic burdens related to the transportation venture. Instead, he confined its inquiry to whether Casale supplied the vehicles and the drivers. We recognize, of course, that in the federal courts "it is the judge's special business to guide the jury by appropriate *legal criteria* through the maze of facts before it." Bollenbach v. United States, 326 U.S. 607, 613, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946) (emphasis added). But in his desire to present the jury with intelligible considerations, the district judge excluded relevant and important instructions.

In this connection it is appropriate that we observe that the Commission has noted that the existence of a lease of equipment with drivers does not determine that a lessor, *ipso facto*, becomes a carrier for compensation; a presumption that the transportation must be licensed by the Commission is created but it is merely rebuttable and not conclusive. See, e. g., Williams—Investigation of Operations, 83 M.C.C. 45 (1960); H. B. Church Truck Service Company, 27 M.C.C. 191 (1940). Compare Lloyd W. Bieseker, Docket No. MC–C–4011 (May 11, 1965) (unreported decision) (statement of trial examiner). In this case there were a number of factors, in addition to the degree of Horn & Hardart's control of the actual transportation, which tended to rebut the presumption that Casale was a contract carrier. For example, Horn & Hardart could not cancel the lease without purchasing the equipment and it, rather than Casale, bore the risk of an increase in the cost of fuel and maintenance.[8] We would be laboring the point unduly were we to repeat in totality every aspect of Casale's arrangement with Horn & Hardart. Suffice to say, that had the jury received instructions which included an exegesis of relevant factors as enunciated in *Drum*, it might very well have concluded that Horn & Hardart had not shifted to Casale the characteristic burdens of the transportation venture and that Casale was therefore not a contract carrier and was not furnishing transportation services within the meaning of the Act.

The government replies, however, that it was appropriate to limit the jury's inquiry because of some history of prior litigation between Casale and the Commission, John J. Casale, Inc. v. United States, 208 F.Supp. 55 (S.D. N.Y.) (a civil case), aff'd per curiam,

---

7. The Court recognized that the shipper's operations possessed a number of the hallmarks of private carriage. It emphasized, however, that in *Drum* the lessor, and not the shipper, bore the risks of premature depreciation, non-utilization of equipment, and a rise in variable costs such as fuel, repairs and maintenance. Id. at 379–380, 82 S.Ct. 408.

8. See and compare note 7 supra.

371 U.S. 222, 83 S.Ct. 311, 9 L.Ed.2d 273 (1962).[9] But the reported decision does not indicate that the lease in that civil case is a substantial facsimile of the one before us in this criminal litigation; and even if it is, *John J. Casale* arose out of proceedings initiated by the Commission. Thus, the court had the benefit of administrative findings of the Commission. Moreover, it is elementary that the test for culpability differs radically between civil and criminal cases.[10] When the government sought to impose the sanctions that flow from a criminal prosecution, a decision we find difficult to comprehend in light of the facts, the defendant was entitled, at the very least, to the safeguards spelled out in *Drum*—a civil case—and certainly not to less, as finally was the case here. Nor, is it sufficient for the government to urge that the record contains evidence that would support a finding of guilt even under a correct view of the law. "[T]he question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials in the federal courts." Bollenbach v. United States, supra, 326 U.S. at 614, 66 S.Ct. at 406.

■ Moreover, there is no merit to the government's argument that Judge Clarie was correct in curtailing the jury's inquiry because he might have believed that the jury is not an appropriate instrument to delve into the subtleties of the transportation industry.

It is true that we, and other courts, have remarked on the complex and difficult matters of judgment that are presented in cases of this nature. See, e. g., Bridge Auto Renting Corp. v. Pedrick, 174 F.2d 733, 734, 737–738 (2d Cir.), cert. denied, 338 U.S. 850, 70 S.Ct. 94, 94 L.Ed. 521 (1949); Agricultural Trans. Ass'n of Texas v. King, 349 F.2d 873, 878 (5th Cir. 1965). And, it seems obvious that except in cases of flagrant and clear abuses of the Act these matters are best left to the Commission in the first instance to give the courts the benefit of that body's expert judgment. Compare Agricultural Trans. Ass'n of Texas v. King, supra.

■ But, the government made the considered choice to institute a criminal prosecution and it appears incongruous, to say the least, for it now to urge the unique maxim that the standards and analysis adopted in *Drum* should apply only in civil cases and thus a defendant in a criminal case should somehow receive less protection than one in a civil case.

■ In sum, the government chose— perhaps unwisely considering the nature of its case—to invoke the awesome power of the criminal law. In doing so it cannot deprive a defendant of the benefit of an accurate statement of the law merely because such a statement would make the jury's task less convenient or manageable.

Reversed.[11]

9. Casale Car Leasing, Inc., the appellant herein, is a wholly owned subsidiary of John J. Casale, Inc. Both corporations lease trucks, with drivers, to shippers.

10. We note in this connection that in *John J. Casale* the court merely held that "rational bases for its [the Commis-

sion's] conclusion and order exist." 208 F.Supp. at 60.

11. We intimate no view concerning the sufficiency of the evidence in light of the criteria approved in *Drum*. And, the question whether—on this record— the Commission would be justified in issuing a cease and desist order is not before us.