## KELLER INDUSTRIES, INC., et al., Plaintiffs-Appellants,

v.

## UNITED STATES of America and Interstate Commerce Commission, Defendants-Appellees,

## National Motor, Freight Traffic Association, Inc., et al., Intervening Defendants-Appellees.

### No. 29864.

United States Court of Appeals, Fifth Circuit.

Sept. 20, 1971.

Rehearing and Rehearing En Banc Denied Oct. 28, 1971.

John W. Prunty, Bernard C. Pestcoe, Prunty, Ross & Olsen, Miami, Fla., for appellants.

Prentice P. Pruitt, Chief Staff Counsel, Lewis W. Petteway, Tallahassee, Fla., for Fla. Pub. Serv. Commission.

Ford L. Thompson, Tallahassee, Fla., Bryce Rea, Jr., Washington, D. C., for National Motor Freight Traffic Association, Inc., Common Carrier Conference—Irregular Route and Regular Common Carrier Conference; Rea, Cross & Knebel, Washington, D. C., of counsel.

William P. Sullivan, Robert M. Sielaty, Washington, D. C., for Contract Carrier Conference of American Trucking Associations, Inc.; Todd, Dillon & Sullivan, Washington, D. C., of counsel.

Clinton Ashmore, Asst. U. S. Atty., Tallahassee, Fla., John H. D. Wigger, Lee A. Rau, Attys., Dept. of Justice, Charles H. White, Jr., Asst. U. S. Atty., Washington, D. C., Walker B. Comegys, Acting Asst. Atty. Gen., William H. Stafford, U. S. Atty., Tallahassee, Fla., for the United States.

Arthur J. Cerra, Acting Gen. Counsel, Raymond M. Zimmet, Atty., I.C.C., Washington, D. C., for the Interstate Commerce Commission.

Before JOHN R. BROWN, Chief Judge, and TUTTLE and GODBOLD, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This appeal presents one of the most frequently litigated questions of transportation law—whether a certain method of transportation is "for-hire" or "private carriage." The new wrinkle, cf. Mike Hooks, Inc. v. Pena, 5 Cir., 1963, 313 F.2d 696, 1963 A.M.C. 1463, is the employment of a joint venture between an upbound and a downbound shipper through the use of jointly leased vehicles operated by drivers ostensibly under the complete control of the momentary user in order to eliminate the abhorrent and uneconomical deadhead backhaul.

The District Court, after a primary jurisdiction reference[1] to the ICC, upheld the ICC's determination that the scheme followed was transportation for compensation and not exempt private carriage. We agree and affirm.

### I. How It All Came About

This litigation began when the shipper participants in the joint venture sought injunctive relief against the Florida Public Service Commission (FPSC), which had been arresting drivers employed by the joint venturers. As in Agricultural Transportation Assn. of Texas v. King, 5 Cir., 1965, 349 F.2d 873, the arrests were for the transporters' failure to have valid ICC certificates or permits as required by §§ 323.02 and 323.28 of the Florida Statutes, F.S.A. The District Court granted a preliminary injunction but determined—quite properly—that the case was one within the special expertise of the ICC and accordingly referred the case to that body for initial disposition under the doctrine of primary jurisdiction.

Keller and the other shippers with whom it had made these agreements then petitioned the Commission to declare that its activities were "private carriage" and therefore exempt from ICC and hence Florida certification requirements. The FPSA as well as several motor carrier associations and conferences intervened,[2] urging that this transportation arrangement be deemed "for-hire" carriage and thus subject to certification requirements pertaining to interstate motor operations. After submission under the modified procedure Division 1 of the ICC decided by a 2–1 vote that the operation of the joint venturers constituted "for-hire" carriage and thus was impermissible without the authorization of the Commission. Keller Industries, Inc., Request for Declaratory Order Regarding Legality of Operations, 1966, 103 M.C.C. 520. Upon request for reconsideration the case was re-heard by the full Commission as a matter of general transportation importance. By an 8–3 vote the ICC upheld the decision of Division 1. Keller Industries, Inc., et al., Request for Declaratory Order Regarding Legality of Operation, 1968, 107 M.C.C. 75. In keeping with the Court's earlier direction the commission certified its record and decision to the District Court.

### II. One Judge? Three Judge?

The shippers filed a new complaint[3] seeking review of the ICC orders and

1. Taylor County Sand Co. v. Seaboard Coast Line Railroad Co., 5 Cir., 1971, 446 F.2d 853; Tampa Phosphate Railroad Co. v. Seaboard Coast Line Railroad Co., 5 Cir., 1969, 418 F.2d 387, 402 (concurring opinion), cert. denied, 397 U.S. 910, 90 S.Ct. 907, 25 L.Ed.2d 90, cited with approval in Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget, 1970, 400 U.S. 62, 91 S.Ct. 203, 27 L.Ed.2d 203; Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84; J. M. Huber Corp. v. Denman, 5 Cir., 1966, 367 F.2d 104; Carter v. American Telephone & Telegraph Co., 5 Cir., 1966, 365 F.2d 486, cert. denied, 1967, 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546; Louisville & Nashville Railroad Co. v. Knox Homes Corp., 5 Cir., 1965, 343 F.2d 887, 893–895; Flight Engineers' International Assn., A.F.L.-C.I.O. v. American Airlines, Inc., 5 Cir., 1962, 303 F.2d 5.

2. Those intervening were: National Motor Freight Traffic Association, Inc., Regular Common Carrier Conference and Common Carrier Conference—Irregular Route, Contract Carrier Conference and the Florida Public Service Commission.

3. In the private suit for a permanent injunction the Court stayed the proceedings pending ICC determination but granted an interim injunction which is still in effect.

requested that it be heard by a three-Judge court under 28 U.S.C.A. § 2325.[4] A three-Judge court was convened, but it concluded that under 28 U.S.C.A. § 1336(b) and 1398(b)[5] jurisdiction was properly before one and not three Judges. Keller Industries, Inc. v. United States, N.D.Fla., 1969, 304 F.Supp. 852. No appeal was taken from this order. The single District Judge then proceeded to hear the case on the ICC record and to affirm the Commission. Keller Industries, Inc. v. United States, N.D.Fla., 1970, 311 F.Supp. 384.

The threshold question is a jurisdictional one, since the shippers continue to urge that the orders and reports of the ICC had to be reviewed by a three Judge rather than a one-Judge court in accordance with the dictates of 28 U.S.C.A. § 2325, note 4, *supra*. We find this contention unpersuasive.

As the three-Judge Court correctly pointed out, before 1964 the shippers' proposed procedure was clearly the correct one. "Prior to the enactment of this statute whenever the Court of Claims or District Court referred the issue to the Interstate Commerce Commission for a resolution, the Commission order emanating therefrom was subject to judicial review by a three judge district court, pursuant to 28 U.S.C. §§ 1336, 1398, 2284, 2321–2325, rather than by the referring court. Consequently, the referring court had to await the decision of the three judge court, the Supreme Court, if an appeal was taken, and any other proceedings which might result from such judi-

cial decisions, before it could proceed to final judgment. See Pennsylvania R. R. v. United States, 363 U.S. 202, 80 S.Ct. 1131, 4 L.Ed.2d 1165 (1960)." Keller Industries, Inc. v. United States, N.D. Fla.1969, 304 F.Supp. 852, 854. But Congress became aware of this "cumbersome and inefficient" procedure, S.Rep. No. 1394, 88th Cong., 2d Sess.; H.R. Rep. No. 1015, 88th Cong., 1st Sess., 1964 U.S.Code Cong. & Admin.News 3235, 3236, observing that one case remained on the docket of the Court of Claims "for 10 years while full review of the Commission's order is being effected." Report, *supra* at 3237. The remedy devised by Congress was the "1964 amendment to 28 U.S.C. §§ 1336 and 1398, Public Law 88–513, authorizing the referring court to have exclusive jurisdiction to review the Commission's order resulting from the referral, * * * Thus, since the 1964 amendment, the referring court, rather than a three judge district court, has reviewed the Commission's order because of its exclusive jurisdiction. See McLean Trucking Co. v. United States, 387 F.2d 657, 659–660, 181 Ct.Cl. 170 (1967) ('The [1964 amendment] was to provide a more streamlined procedure for judicial review of questions that involve the primary jurisdiction of the Interstate Commerce Commission and are referred to it for a preliminary determination'); Seaboard Air Line R. R. v. United States, 387 F.2d 651, 654–655, 181 Ct.Cl. 719 (1967)." Keller, *supra*, 304 F.Supp. at 854–855.[6]

---

4. "An interlocutory or permanent injunction restraining the enforcement, operation or execution, in whole or in part, of any order of the Interstate Commerce Commission shall not be granted unless the application therefor is heard and determined by a *district court of three judges* under section 2284 of this title."

5. "When a district court or the Court of Claims refers a question or issue to the Interstate Commerce Commission for determination, the court which referred the question or issue shall have exclusive jurisdiction of a civil action to enforce, enjoin, set aside, annul, or suspend, in whole or in part, any order of the Inter-

state Commerce Commission arising out of such referral." 28 U.S.C.A. § 1336(b).

"A civil action to enforce, enjoin, set aside, annul, or suspend, in whole or in part, an order of the Interstate Commerce Commission made pursuant to the referral of a question or issue by a district court or by the Court of Claims, shall be brought only in the court which referred the question or issue." 28 U.S.C.A. § 1398(b).

6. Shippers cite Leitchfield Manufacturing Co. v. United States, W.D.Ky., 1970, 312 F.Supp. 430, vacated and remanded 1970, 398 U.S. 280, 90 S.Ct. 1729, 26 L.Ed. 2d 232; Interstate Motor Freight System

We are aware that in Agricultural Transportation Association of Texas v. King, *supra*, 349 F.2d 873, 884–885, we adopted a contrary position, but that was prior to the ICC reference and later report. The issue was not then squarely presented, and the opinion of the dissolved three-Judge court persuades us that the initial forecast was mistaken.

We need only add that since §§ 1336(b) and 1398(b), note 5 *supra*, parallel the Court of Claims and the District Courts with respect to referrals to the ICC, Congress could not have meant to prescribe a three-Judge review if referred by a single Judge but a Court of Claims review if referred by the Court of Claims. Our reading likewise recognizes the peculiar nature of the role of the administrative agency in a "primary jurisdiction" referral. Agency determinations are sought as an aid in judicial determinations, not as a complete substitute for them.[7] Since the judicial remedy sought is the granting of an injunction against allegedly unauthorized acts of State officers—ordinarily a matter for a single Judge—the single Judge Court must employ the agency's determination and hence may properly review it for acceptability.

We hold that 1336(b) and 1398(b) mean in effect that Congress has created an exception to § 2325 and has declared that a referral case is not one for three Judges. Thus the review of the ICC orders was properly for the referring Judge.

### III. The Joint Venture

### Cook and Keller Get Together

Keller Industries, a large integrated company with activities in a number of different states,[8] is located primarily in Miami and is essentially a northward bound shipper of finished aluminum products. See Scroll, Inc. v. Commissioner of Internal Revenue, 5 Cir., 1971, 447 F.2d 612. But Keller always has had the problem of an empty backhaul from Northern cities to Miami. Then E. N. Cook (since deceased) entered the scene. Cook was an old hand at figuring up schemes—commercially successful but almost invariably held to be illegal[9]—by which upbound and down-

v. United States, W.D.Mich., 1965, 243 F.Supp. 868; Florida East Coast Railway Co. v. United States, M.D.Fla., 1965, 242 F.Supp. 490, aff'd, 1965, 382 U.S. 161, 86 S.Ct. 316, 15 L.Ed.2d 228; and Allen v. United States, S.D.Fla., 1960, 187 F.Supp. 625 for the proposition that three-Judge jurisdiction is proper. None of these cases is relevant, for none deals with a case, such as the present one, brought in the District Court and then referred to the ICC for initial disposition. Furthermore the assertion that the amended statutes apply only if an independent civil action is brought against the ICC and Government is equally irrelevant since the shippers have done just that in this case.

7. "The primary jurisdiction doctrine is thus no more than recognition of the fact that the compelling necessity for regulatory uniformity and consistency, coupled with the almost infinite variety of administrative rules and regulations which affect or may affect a particular dispute, initially require administrative rather than judicial fact-finding and rule-applying expertise." Taylor County Sand Co. v. Seaboard Coast Line Rail-

road Co., *supra*, note 1 [446 F.2d p. 853] and cases cited therein.

8. Keller moves its merchandise outbound to destinations in Alabama, Georgia, Tennessee and North Carolina.

9. See, e. g., Equipment Rental, Inc.—Investigation of Operations, 1957, 71 M.C.C. 311; Driver's Dispatch, Inc. v. Florida R.R. and Pub. Util. Comm'n, Fla. Dist.Ct.App., 1964, 166 So.2d 899, 900, cert. denied, Fla.Sup.St.1965, 174 So. 2d 31; State ex rel. Florida Railroad and Public Utilities Commission v. Ingalls, Fla.Dist.Ct.App., 1958, 106 So.2d 570, 571. The system employed in *Equipment Rental*, *supra*, was remarkably similar to that here. Cook, as president of an organization known as traffic Advisory Service, Inc., there arranged to have individual business concerns jointly lease trucks and hire drivers, and transport inbound to Florida the respective goods of the one concern, and outbound from Florida the goods of the other concern, and prorate the transportation expenses among themselves (71 M.C.C. at 312–14). The driver, to be paid by each concern, was to be "under the direct control and supervision of the joint lessees at all

bound shippers of their own goods were brought together to keep the trucks full both ways. Cook proposed to coordinate Keller's shipping with that of companies in Florida who imported their material from the North. Basically his idea was to permit other companies, unrelated to Keller, to ship to Florida using the same truck and driver that Keller had used to ship from Florida. To carry out the scheme Keller employed Cook as Traffic Coordinator. He was to solicit the downbound participants for the operation, to arrange for truck leasing, and to hire drivers. A typical example of the arrangement would run like this: Keller enters a joint venture agreement [10] with

times." (71 M.C.C. at 315). Cook's function was to "coordinate and supervise the transportation and operation of the leased equipment, including the recommendation of suitable drivers for employment by the joint lessees." (71 M.C.C. at 313). The Commission held such operations to be illegal for-hire motor carriage based on the reduction or elimination of the transportation operating expenses incurred by the individual concerns, because "each company saved the expenses of operating empty and * * * the savings constituted compensation received by each indirectly." (71 M.C.C. at 316).

10. The Joint Venture Agreement was little more than an agreement to agree when and as and upon such terms as both parties might then find convenient or acceptable. See, e. g., "when * * * desirable" (par. 1), rental or such terms "as are acceptable" (par. 2), costs to be divided "equitably" (par. 3), prior to each round trip the parties shall agree "upon portion attributed to each" (par. 4) in the following:

### JOINT VENTURE AGREEMENT

WHEREAS, we, the undersigned, are presently engaged in manufacturing, wholesaling, retailing, and/or distributing certain wares, goods, and merchandise and we are desirous of providing our own transportation for bringing our raw materials, wares, goods, and merchandise into the Miami area; and shipping our wares, goods, and merchandise out of the Miami area; and we are specifically desirous of affecting an efficient, economical, and satisfactory method of transporting our materials, goods, wares, and merchandise into and out of the Miami area, not for compensation, but at our own expense, and as an incident to the conduct of our respective mercantile business, we further agree as follows:

1. That when one of the undersigned has shipments northbound from the Miami area to certain destinations and the other shipments southbound from or near those destinations to the Miami area in such proximity of time as may make it desirable to combine efforts and place such shipments on a round-trip basis, we agree to enter into a joint lease whereby we will jointly rent tractors and trailers for the transportation of our raw materials, wares, goods, and merchandise and we further agree to jointly hire drivers on a round-trip basis.

2. That such tractor and trailer rental shall be on such terms and conditions as are acceptable to both parties and likewise the driver must be acceptable to both parties.

3. That the costs of this joint venture shall be divided equitably between the undersigned and agreed upon prior to the commencement of each round trip.

4. That prior to the commencement of each round trip the parties shall agree upon which portion of such round trip is to be attributed to each party and each party during that portion of the round trip so attributed to it shall be responsible for the raw materials, wares, goods, and/or merchandise transported therein; the loading and unloading of same; the payment of charges on toll roads and bridges; the payment of overload fines.

5. That each party shall hold harmless and indemnify the other party for any expenses or liabilities incurred by such other party which are not properly attributed to it under the provisions of paragraph 4 above.

6. That this joint venture agreement may be terminated at the option of either party by 30 days written notice to the other party at its principal place of business in Dade County, Florida.

WITNESS our hands and seals this 9th day of March, 1965.

Keller Industries, Inc.　　　　　　　Miami Battery & Electric Corp.

/s/　E. N. Cook　　　　　　　　　/s/ _____
　　　Authorized Signature

one of the southbound shippers [11] whose origin shipping point was close to Keller's destination. Keller through Cook arranges a joint lease of a truck from a truck rental agency. The first agency sought is Control Systems, Inc. which was formed and is still financed by Keller. If no truck is available there, Keller contacts a second agency, Beacon, Inc., a company that had formerly been associated with Cook. Then Keller and the other joint venturer sign a joint lease. Each party bears the cost of moving his own goods from origin to destination. By mutual agreement, respecting the particular trip, the cost of moving the empty truck from Keller's destination to the origin point of the returning shipper's goods is allocated between the two. The lease is based on a daily rate plus mileage without regard to the transported goods. In case a driver has road trouble, he calls the shipper whose goods he is then transporting. Each shipper must insure his own goods, and each helps defray the collision coverage insurance of the leasing company. Each shipper is billed directly by the lessor for its share of the rental and expenses, and each is solely responsible for damages or losses to his own cargo.

From a so-called drivers' association, Keller also arranges to obtain a driver for the round trip, and both shippers must approve the driver. Although in the papers before the ICC this practice is characterized as jointly employing the driver, under the terms of the employment contract the driver becomes the employee of each shipper during the part of the trip allocated to that shipper. For their respective parts of the trip, Keller and the other joint venturer pay the driver's wages and tolls, and each deducts withholding taxes and social security from the driver's pay. The shippers pay the driver by two separate payroll checks and pay their portions of social security and workmen's compensation.[12] Each shipper has sole control over the equipment and the driver for his part of the haul (or that "attributed to" him by contemporary agreement). See par. 4, note 10, *supra*.

## IV. To ICC The Venture Illegal

On such facts, the ICC found that shippers were jointly operating as interstate motor carriers for compensation without possessing the necessary licenses. 103 M.C.C. 18; 107 M.C.C. 76–78. Considered together, the findings of the Division and the entire Commission establish that shippers were not merely carrying their own goods but rather were jointly providing "compensation" for each other —in the sense that term is used in the statutory definition of a "common carrier by motor vehicle," 49 U.S.C.A. § 303(a) (14), or "contract carrier by motor vehicle," 49 U.S.C.A. § 303(a) (15)—particularly by relieving each other of the cost of returning an empty truck to the point where their respective goods originated for shipment. By thus avoiding or reducing their individual transportation expenses through the joint arrangements, the shipper groups were in effect performing for-hire motor carriage "for each other, with the reimbursement of expense constituting 'compensation'."

11. These shippers were: American Vinyl Corporation, Coastal Equipment Company, Caudle Manufacturing Company, Flamingo Wholesale Distributors, Inc., Florida Vinyl Corporation, B. B. Lotspeich, d. b. a. Lotspeich Company, Metal Screen, d. b. a. Miami Rug Company, Miami Rivet Company, Moore's Wholesale, Inc., Nehi Bottling Company of Miami, Neil Distributors, Inc., Palmer Supplies Company of Florida, Poinciana Chinaware, Inc., Sedco Manufacturing Company, S. M. Green, d. b. a. Southern Manufacturing Company, Sunaid Food Products, Inc., Surf Lighting Inc., Walton Wholesale Corp., Yoo Hoo Chocolate Beverage Company, Benner Box Division of New Haven Board and Carton Company, MacMillan Oil Company of Florida Inc. and Nord and Stannard Inc. By separately filed petitions on December 7, 1965, the last-named three companies sought to withdraw from the proceeding, but their petitions were denied by order of February 2, 1966.

12. For each employer (Keller and downbound shipper) the driver has a W-4 form, an application for employment and a physical certificate.

The Commission, after pointing out that its decision fully comported with earlier ICC decisions reaching the same result, 103 M.C.C. 530, also declared that the solicitation by Keller of the other shippers in the scheme was "completely irreconcilable with the private carriage concept envisioned by the statutory scheme of regulation," and that if these joint motor activities were not regulated, they would inevitably be detrimental to the public interest, 107 M.C.C. 78.[13]

## V. The Statutory Structure

The statutes dealing with "for-hire" versus "private carriage" transportation are the source of both controlling principles and problems of application. Our function must be to determine "the applicability to a narrow fact situation of imprecise definitional language which delineates the coverage of the measure." United States v. Drum, 1962, 368 U.S. 370, 376, 82 S.Ct. 408, 411, 7 L.Ed.2d 360, 365.

The Motor Carrier Act of 1935 requires an ICC certificate or permit for transportation operations of common carriers[14] and contract carriers.[15] Though regulation of these carriers was extensive, Congress recognized that there was still a place in the transportation picture for the carriage of one's own goods in equipment operated by a shipper. Specific recognition was therefore given to a third category of "private carrier of property by motor vehicle." Part of the problem is that this category was defined negatively in terms of what it was not— not a common, not a contract, carrier.[16]

13. In her dissent Commissioner Brown agreed that a shipper cannot "solicit participation by others in joint transportation activities which, in substance, result in two shippers providing for-hire transportation for each other" and dissented only from the Commission's application of this principle to the facts of the case. 107 M.C.C. 79–80.

14. "The term 'common carrier by motor vehicle' means any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation, whether over regular or irregular routes, except transportation by motor vehicle by an express company to the extent that such transportation has heretofore been subject to chapter 1 of this title, to which extent such transportation shall continue to be considered to be and shall be regulated as transportation subject to chapter 1 of this title."
49 U.S.C.A. § 303(a) (14).
"Except as otherwise provided in this section and in section 310a of this title, no common carrier by motor vehicle subject to the provisions of this chapter shall engage in any interstate or foreign operations on any public highway, or within any reservation under the exclusive jurisdiction of the United States, unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission authorizing such operations * * *."
49 U.S.C.A. § 306(a) (1).

15. "The term 'contract carrier by motor vehicle' means any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation (other than transportation referred to in paragraph (14) of this subsection and the exception therein), under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."
49 U.S.C.A. § 303(a) (15).
"Except as otherwise provided in this section and in section 310a of this title, no person shall engage in the business of a contract carrier by motor vehicle in interstate or foreign commerce on any public highway or within any reservation under the exclusive jurisdiction of the United States unless there is in force with respect to such carrier a permit issued by the Commission, authorizing such person to engage in such business: * * *."
49 U.S.C.A. § 309(a) (1).

16. "The term 'private carrier of property by motor vehicle' means any person not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee,

Under the Act, a private carrier is exempt from economic (but not safety) regulation.

This reverse negative definition brought about administrative and enforcement difficulties. The "ICC believed * * * that § 203(a) (17) [49 U.S.C.A. § 303(a) (17)]. was not sufficiently explicit, particularly since decisions of some lower courts * * * raised doubts whether a truck operator could be found to be an unauthorized 'for-hire' carrier in the absence of some affirmative showing that his operations brought him within the definitions of common or contract carriage. Consequently the Commission sought additional legislation." Red Ball Motor Freight Inc. v. Shannon, 1964, 377 U.S. 311, 315, 84 S.Ct. 1260, 1263, 12 L.Ed.2d 341, 344 (footnote omitted). The new legislation,[17] enacted in 1958, was designed to clarify the meaning of "private carriage" so that the ICC could root out all "subterfuges which might be employed to engage in unauthorized for-hire transportation." Red Ball, *supra*, 377 U.S. at 316, 84 S.Ct. at 1263, 12 L.Ed.2d at 345.

### VI.   Is Transporter A Carrier In Substance?

### Are Carrier Burdens Borne?

But with the private carrier "defined simply as transporters of property who are neither common nor contract carriers * * * the statute will yield up no better verbal guide to the reach of its licensing provisions than transportation 'for compensation' or 'for-hire'." *Drum,*

*supra,* 368 U.S. at 376, 82 S.Ct. at 411, 7 L.Ed.2d at 365.

Of major importance here, these considerations led the Supreme Court to declare this pervasive theme: "Because the definitions must, if they are to serve their purpose, impose practical limitations upon unregulated competition in a regulated industry, they are to be interpreted in a manner which *transcends the merely formal* (emphasis added)." *Drum, supra,* 368 U.S. at 375, 82 S.Ct. at 411, 7 L.Ed.2d at 364.

In *Drum* the Court had to determine the applicability of the Motor Carrier Act to a transportation scheme devised by Oklahoma Furniture Manufacturing Company for the transportation of its own manufactured furniture. The system was for the lease of tractors from owner-operators and the payment to such lessor-owner-operators of a specified mileage rental and of a mileage fee as compensation for the driver. Tracing the development by the ICC of the two "control" and "substance" tests, and after assuming the record showed requisite controls by the shipper over the physical operations of the transportation, the Court held that in substance the shipper was really a for-hire carrier. In reaching this conclusion the Court tested the facts against the standard of whether the transporter had been willing to "assume in significant measure the characteristic burdens of the transportation business," 368 U.S. at 376, 82 S.Ct. at 411, 7 L.Ed.2d at 365, or alternatively, whether the transporter "had so

---

when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise."

49 U.S.C.A. § 303(a) (17).

17. The amendment (49 U.S.C.A. § 303(c)) provided:

"Except as provided in section 302(c) of this title, subsection (b) of this section, in the exception in subsection (a) (14) of this section, and in the second proviso in section 306(a) (1) of this title, no person shall engage in any for-hire transportation business by motor vehicle, in interstate or foreign com-

merce, on any public highway or within any reservation under the exclusive jurisdiction of the United States, unless there is in force with respect to such person a certificate or a permit issued by the Commission authorizing such transportation, nor shall any person engaged in any other business enterprise transport property by motor vehicle in interstate or foreign commerce for business purposes unless such transportation is within the scope, and in furtherance, of a primary business enterprise (other than transportation) of such person." Act of Aug. 12, 1958, Pub.L. 85–625, § 8, 72 Stat. 573, 574.

far emancipated itself from the burdens of transportation that to permit it, on such terms, to secure a transportation service from these unlicensed owner-operators would be inconsistent with the statutory scheme." 368 U.S. at 380, 82 S.Ct. at 413, 7 L.Ed.2d at 367. On this approach the Court specifically upheld the ICC delineation of the significant burdens which the shipper did not bear because, through the scheme, they had been shifted to the lessor-owner-operator.[18] Accordingly the Court referred with approval to one of our very early cases which, with others, developed the "substance" test.[19]

## VII. No Deadhead Risk
## Joint Venture A Formalism

It is perfectly evident that if the joint venture structure fills the bill, the Keller scheme eliminates almost[20] altogether one of the awful burdens of a carrier—that of the deadhead backhaul. Indeed, this was the genesis of the plan.

At this point, form is altogether controlling. For the shippers have to recognize that in the "beaten track of administrative decision," *Drum, supra,* 368 U.S. at 384, 82 S.Ct. at 415, 7 L.Ed.2d at 369, the scheme would fail were the lessee entity a corporation owned jointly by them[21] or if separate leases with the upbound and downbound shippers were executed by the lessor agency,[22] or if a third party, not just an employee of one of the two shippers (Keller), were acting as an independent traffic advisor,[23] or if the trucks were leased jointly to the two without a joint venture,[24] or if the trucks were not jointly leased but were jointly owned,[25] or if the shippers had formed one of the popular co-ops.[26]

There is no real difference in the substance of these agreements because the joint venture structure—whatever its status as a distinctive legal entity—is nothing more than the momentary pairing on the vaguest of terms (see note 10,

18. "Here each owner-operator assigns his motor vehicle for a continuing period of time to the exclusive use of the company, furnishing a service designed to meet the distinct need of the company. He provides a service in which the equipment is furnished, maintained, and driven by the owners thereof to transport property in interstate commerce. He guarantees a fixed and definite cost for the transportation, bears the risk of profit or loss from such transportation hazards as delays in transit, breakdowns of equipment, and highway detours, and meets all of the cost of operation including appropriate licenses and trip expenses. 79 M.C.C., at 412."

19. In Georgia Truck System v. Interstate Commerce Commission, 5 Cir., 1941, 123 F.2d 210, 212, we held that the Interstate Commerce Act—
"* * * is a highly remedial one, that its terms are broadly comprehensive enough to bring within them all of those who, no matter what form they use, are *in substance* engaged in the business of interstate or foreign transportation of property on the public highways for-hire * * *." (Emphasis added).

20. We say "almost" because under par. 4 of the joint venture agreement (see note 10, *supra*) Keller and the downbound

shipper make a trip agreement based upon the distances attributed to each, which includes provision for bearing the costs incident to the leg between Keller's destination point and the downbound shipper's origin point. But this is detrimental, not helpful, to the validity of the scheme. To the extent Keller bears the extra cost, the downbound shipper gets "compensation" in the form of an available vehicle FAD (free at dock, cf. FOB).

21. Enterprise Trucking Corp., Contract Carrier Application, 1941, 27 M.C.C. 264.

22. American Equipment Rental, Inc., Investigation, 1964, 96 M.C.C. 383, aff'd per curiam, S.D.Fla., 1965 [Civ. 65–241, August 16, 1965].

23. Robert Allen, et al—Investigation of Operations and Practices, 1959, 79 M.C.C. 727, aff'd, S.D.Fla., 1960, 187 F.Supp. 625; American Equipment Rental, Inc., note 22, *supra.*

24. Equipment Rental, Inc., Investigation of Operations, 1957, 71 M.C.C. 311. The driver was described as an employee of "joint employers."

25. Southern Fruit Distributors, Inc., Contract Carrier Application, 1942, 31 M.C.C. 77.

26. Shippers Cooperative, Inc. v. ICC, 9 Cir., 1962, 308 F.2d 888.

*supra*) of two unrelated businesses for the sole purpose of procuring transportation through precise prearrangement without incurring the cost either of getting the vehicle to its destination or returning it empty. The Act [27] does not confine regulation to specific legal entities. To allow two unrelated shippers somehow to be engaged in their respective primary businesses because the device nominally makes the lease a joint one would be to interpret the Act, not "in a manner which transcends the merely formal," United States v. Drum, *supra*, 368 U.S. at 375, 82 S.Ct. at 411, 7 L.Ed. 2d at 364, but in a manner which magnifies form.

In reaching this conclusion we need not disparage either the moral or legal purity of the arrangement. Indeed, we can credit all, and in so doing we really credit nothing, for that is what the "agreement" adds up to. At the outset, the joint venture agreement (note 10, *supra*) is but an outline of things on which the parties are subsequently to negotiate and agree upon—if they can. But more important, crediting it as a covenant hammered out after the most contentious negotiations as though each party were an independent free agent, and assuming that it committed them to significant obligations, the joint agreement really was joint only in the paper and the signature. It did call for a joint lease—but nothing more. Under the project and the agreement, only the lease was precise in spelling out what each was to do. Except for the tag end backhaul (see note 20, *supra*) the agreement simply outlined how each of the supposed joint venturers were to go their separate ways. Thus, as to each leg the

upbound or downbound shipper—not the joint venturers—was to be the "employer" of the driver, responsible for direction, control and compensation. Indeed, this was indispensable to even an arguably valid arrangement.[28] All it amounted to, in effect, was a device which brought the parties together for the barest fraction of an indefinable moment, only for each to go his own way with absolutely—the word has to be absolutely—no interference, either actual, legal, or possible, by the other.

To be sure, *Red Ball, supra*, does recognize that there may be ways to eliminate the backhaul burden without violating the Act. But this scheme is not one of them.

### VIII. The Coordinator A Solicitor

Added to this, the device to eliminate the deadhead backhaul had another characteristic so typical of today's highly competitive, intermodal transportation complex. The whole arrangement depended on successful initial solicitation in Keller's behalf by Cook or his successor. The melding of the upbound and downbound could not be left to chance from some highway corner stand. Keller's scheme—and it was born there—called for pairing. To pair, one had to find an opposite. Here it was solicitation of downbound shipments. Whether upbound or downbound, the very essence of transportation is the effective solicitation of cargo. If it was not "transportation" [29] as such, it was not less than the activity of a broker.[30]

### IX. Piedmont No Obstacle

■■ Finally, shippers assert that, until released by an en banc decision, we

---

27. As the Court in Shippers Cooperative, Inc. v. ICC, 9 Cir., 1962, 308 F.2d 888 pointed out, § 203(a) (15) of the Act (49 U.S.C.A. § 303(a) (15)) defines a contract carrier as "*any* person which engages in transportation by motor vehicle * * * for compensation," and § 203(a) (1) (49 U.S.C.A. § 303(a) (1)) defines the term "any person" as "*any* individual, firm, copartnership, corporation, company, association or joint-stock association * * *." (emphasis added).

28. If the plan really constituted "joint employment," it would be a case of Keller's driver operating the truck for the downbound shipper. Since the arrangement is in no sense gratuitous, this result would be a classic case of transportation for-hire.

29. See the broad definition of "services" and "transportation" in 49 U.S.C.A. § 303 (a) (19).

30. 49 U.S.C.A. §§ 303(a) (18); 311(a).

are bound by ICC v. Piedmont Sales Co., N.D.Ga., 1963, 16 Fed.Car. Cases No. 81623, aff'd, 5 Cir., 1964, 330 F.2d 351. There is, to be sure a remarkable similarity but it is outweighed by the dissimilarities. Of greatest significance, *Piedmont* was tried on the facts in and by the District Court. Our per curiam affirmance merely put the imprimatur of F.R.Civ.P. 52(a) on the fact-legal conclusions. On the other hand, what we really review here is not a District Judge's conclusion but more properly those of the ICC. The standard of review is quite different, and should be. The ICC's determinations should not be set aside "if they are based upon adequate findings, and if they are supported by substantial evidence." Allen v. United States, S.D.Fla., 1960, 187 F.Supp. 625, 627 (3-Judge Court). The judicial function is exhausted when there is found to be warrant in the law and a rational basis for the conclusions reached by the Commission. Mississippi Valley Barge Line Co. v. United States, 1934, 292 U.S. 282, 286–287, 54 S.Ct. 692, 693–694, 78 L.Ed. 1260, 1264–1265, and resort to the doctrine of primary jurisdiction does not change the fact that an ICC order is under review.[31]

In addition in *Piedmont* there was no question of blending an upbound and a downbound shipment together. The upbound was clearly exempt because of the exempt (agricultural) nature of the cargoes. The only question was whether there was a genuine lease for the downbound trip. The Court held that there was.

The upshot is that the District Court correctly upheld the ICC order and with that decision falls the injunction and complaint against the Florida Public Service Commission.

## X. Looking Back To Look Ahead

Without casting blame on parties, counsel, Commission or Court, but accepting responsibility for that attributable to us,[32] the time table in this case is not a happy picture in terms of discontinuance of operations held consistently to be illegal.[33] For six years these shippers have engaged in unlawful transportation.

With the presumption against the validity of these lease-rentals with drivers obtained from outside sources [34] and the almost invariable determination of illegality by the ICC and Courts,[35] we are convinced the shoe should be on the other foot.

District Courts should therefore be cautious in granting temporary or interim injunctive relief against enforcement actions by public officers, Federal or State. Probability of ultimate success as a factor justifying interim relief [36] has too often gone unconsidered.

31. See Locust Cartage Co. v. Transamerican Freight Lines, Inc., 1 Cir., 1970, 430 F.2d 334, 341: "Given this premise, we think the district court erred in substituting its own findings and conclusions for those of the Commission. When the Commission resolves a question within its primary jurisdiction, its resolution should not be set aside unless it exceeds the Commission's statutory authority or is unsupported by substantial evidence. Illinois Central R. R. v. Norfolk & Western Ry., 385 U.S. 57, 69, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966) ; Consolo v. Federal Maritime Commission, 383 U.S. 607, 619–621, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966) ; Keller Industries Inc. v. United States, 311 F.Supp. 384, 387 (N.D.Fla. 1970)."

32. The case was argued on December 9, 1970.

33. August 1965—Complaint filed in District Court against Florida PSC
    October 1965—Order Requiring Reference to ICC
    November 1966—ICC Division 1 Report
    March 1968—ICC-Full Commission Report
    May 1968—Complaint set aside by ICC order
    March 1970—District Court judgment
    July 1970—Appeal Record filed

34. See *Drum, supra,* and *Red Ball, supra.*

35. Nearly all of these situations have involved movements into and out of Florida (see notes 21–25, *supra*).

36. 7 Moore, Federal Practice par. 65.04 [1] ; *American Family Life Assurance Co. of Columbus v. Aetna Life Insurance Co.,* 5 Cir., 1971, 446 F.2d 1178.

Such an approach would fit in with the structure of regulation, which puts upon the transporter the duty to obtain a certificate or permit and, pending the determination of the application, the obligation to obtain a temporary authorization based upon a showing of "immediate and urgent need," 49 U.S.C.A. § 310a. This alternative would likewise give recognition to the Congressional policy expressed in the 1965 Amendments [37] aiming toward more effective and speedy Federal court enforcement proceedings.

Affirmed.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before JOHN R. BROWN, Chief Judge, and TUTTLE and GODBOLD, Circuit Judges.

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

37. Public Law 89–170, 79 Stat. 649, now 49 U.S.C.A. § 322(b) (2), (3). See 1965 U.S.Code Cong. and Admin.News 2923.